Whenever you're ready, Ms. Tucker. Good morning, excuse me, good morning. May it please the court. Lee Tucker of the Federal Defender's Office for Samuel Swoopes. On de novo review and deferring only to the facts that are not in dispute, relief should be granted because Mr. Swoopes was denied his due process rights and his Sixth Amendment right to a fair trial. There was one particular critical evidentiary fact established at trial and that was that the victim Linda had told police the same night of the offense that the gunman did not have a scar. That was also in the context of Linda and the other two victims all failing to identify Mr. Swoopes in a photo lineup conducted within a few weeks of the offense. Despite that, or it was against that backdrop and the fact that identification was the pivotal issue in this case, as every court has acknowledged, that the prosecutor in his rebuttal argument wrongly stated that Linda had mentioned a scar on the very night of the incident. Was the jury given the usual instruction that the arguments of counsel are not evidence in the case and that their recollection as to the facts controls? Your Honor, they were given that generic instruction. They were not, however, specifically advised as to this particular error, which was, of course, a misstatement of the evidence. Well, counsel, doesn't our – I thought our case law says that we presume that juries follow the instructions if they're properly instructed. Your Honor, what should have happened in this case to – two answers to that. Number one, what should have happened to vitiate the prejudicial effect of that misstatement would have been, as the Supreme Court stated indomitably, for the judge to direct the jury's attention, not just to give the generic instruction, but to direct the jury's attention specifically to the misstatement and to inform the jury that it was unsupported. But if the jury is instructed that arguments of counsel are not facts and that it's the jury's recollection of what they heard at trial that controls, doesn't that directly address this situation? I mean, this is not an uncommon occurrence where counsel misstates either accidentally or sometimes intentionally. Your Honor, were it only the prosecutor's misstatement, then that might be enough to assuage our concern. But in this case, what's particularly egregious about it is that the jury then, clearly confused by the prosecutor's statement, had one single question during the deliberations, and that question was, we would like to see any statement made by Linda of a blemish or scar prior to the physical lineup, because, of course, it was the physical lineup 18 months later when she said it's the scar. And that question, as this Court has established, shows a critical concern by the jury, and the judge then, rather than answering that innocuously, replies, the statement is not admissible. But, of course, there is no statement. There is no the statement. And so the prosecutor makes the misstatement. The judge essentially corroborates that statement. And those things together created the fundamental unfairness here and combined to create the substantial and injurious effect. Counsel, I have a couple of questions, too. The way I recall the closing argument, the prosecutor, at one point he said night, and at one point he said day. Why doesn't that correct what he said? Your Honor, at page 44 of the excerpts of record in the post-conviction court's findings, as the post-conviction court summarized, quote, in the prosecutor's rebuttal argument, he stated that Linda had told police about a scar, and the scar was mentioned the night of the incident. Oh, I was looking at the transcript, actually. Yes. What the prosecutor actually said. The very day. I don't believe that would correct it. It would have corrected it, perhaps, if he had said the very day of the physical lineup, she mentioned the scar. But in conjunction with saying the very night and saying the blemish kept coming up, the fact that he might have also referenced a daytime statement does not ameliorate that. Let me ask you now about the blemish. I went through the color photos in the excerpts, and whether it's a blemish or a scar, you can see it in some of them and not others. It didn't look all that clear to me that you'd have a firm observation and recollection of it. Did it look clear in anything that was shown to the jury? Well, I don't know that it looked any different in what was shown to the jury. I don't believe it did. But the fact, I'm sorry, Your Honor, the issue isn't how obvious the scar was. Really, the issue is she had said there was no scar. And then 18 months later, under a very suggestive lineup, she said, I was looking for a scar. Now let me get to the suggestive lineup. Yes.  I'm trying to prevent a particular type of police misconduct, basically bringing the witness into the room and no lawyer for the defense present, and suggesting in one way or another that a particular one of the people in the lineup is the perpetrator so that the witness takes the policeman's guidance and the identity is tainted by that. Here, so far as I can tell, all the initiative was taken by the three victims rather than by the police. And I think the Supreme Court has subsequently confirmed my impression of this in a case called Perry, that unless the police arrange the suggestive circumstances, Biggers just doesn't apply to it. What am I missing there? So, Your Honor, a couple of things. First of all, we have two separate problematic suggestive identifications. One, the two men who went to the courtroom. And there, Perry and the state argues . . . The police aren't suggesting anything there. They went to the courtroom on their own initiative and made the identification on their own initiative, told the police that's the guy. Your Honor, this is the background. So, Detective Scuda told the victim, Randy, and this is in the excerpts of Record 3 at 399 to 400, at 430 and 435. He told Randy there had been a break in the case. He gave him Mr. Swoop's name. He told him that he thought Mr. Swoop might have been involved in the crime against Randy, that he might have links. He told him that the other case would be going to trial. He knew that Randy, as well as the other victims, had wanted a physical lineup. He'd known that from a few weeks after the offense. And he refused to answer Randy's question about whether they had seen Mr. Swoop's photo in a photo lineup. So, he did everything short of saying, here's your chance to go see him and identify him. So, Perry does talk about police conduct. It's also been framed by the Sixth Circuit and others in terms of the direction of the attention, as Your Honor alluded, the direction of the attention to the suspect. Detective Scuda did everything he could not to dissuade Randy, who he knew, wanted to see Mr. Swoop's foot from doing that. As to Linda. Well, I'm not sure that's totally accurate. As I recall the record, the detective would not answer, was it Mark's question as to whether or not this was the guy? And that the detective, when they did show up, told the two men specifically, don't tell Linda what you just saw. Isn't that what the record shows? The record shows that he told them not to tell Linda what they had seen. So, what, I guess, are you trying to argue contrary to the state court finding that the police did engage in misconduct? Is that your argument? Well, Your Honor, yes, and we've argued that in our briefs. However, I think even agreeing, even if you were to agree with the state court that there was no police misconduct, relief is still required here. I guess maybe this goes back to something you said at the very beginning of your argument. It looks as though you're asking us to reweigh the facts de novo. And even if it's a pre-EDPA case, don't we still give some deference to the state court findings unless the evidence simply doesn't support? Your Honor, I'm not asking you to reweigh the facts de novo. That's why I said, even if you want to assume there was no police conduct, relief is still Well, we've got two key things. One is whether or not there was police misconduct. And the other was whether or not, with regard to the way the judge answered the question, whether or not Mr. Swoops's lawyer was involved at all in formulating the response. So, yes, and I'm afraid the briefs, unfortunately, got into the weeds on that. But even assuming it was not an ex parte response. Well, that was the finding of the state court, was it not? It was, although Do we defer to that or not? Well, so the state court said there was not an ex parte communication. However, both the post-conviction court and the federal court strongly suggested that the formulation of the answer was ex parte with their reference to unfortunate wording. However, I did want to get I thought there was testimony about the fact that in Pima County at the time, the practice was to do this off the record in chambers with the lawyers talking to the judge. There was also evidence submitted by both defense counsel and Mr. Swoops that they never saw that, that Mr. Swoops never saw it. Well, I thought the defense lawyer said he couldn't remember. But that if he had seen it, he would have objected to it, which, of course, all of us can understand why that would be, because it was a prejudicial misstatement of evidence on the most pivotal issue. And going back And the prosecutor's dead now, is he not? Everybody's dead or old. Everybody's unavailable. The statement was, quote, it's not admissible. Correct? That's what the judge said to the jury. The statement is not admissible. The statement. All right. Now, I'm from out of state, obviously. But the question I have is whether or not, and I tend to agree with Judge Tallman, that the Arizona Court of Appeals is entitled to deference on their ruling regarding that particular issue. But has the Ninth Circuit ever said that a judge who communicates with a jury during deliberations in this type of situation, which seems to be a bit critical, or not, violates the right, the Sixth Amendment right to counsel because they didn't run the question past the defendant's lawyer? Yes, Your Honor. In Musladeen, which is in the briefs, this court recognized the critical that formulating the answer is a critical stage and underscored. All right. Go ahead. And underscored how susceptible jurors are to statements made by a judge, in particular, during deliberations. And I just, I- But it said it was critical, but it didn't say it was structural error. Right. And doesn't it go on- Legal decision. That's not a factual decision. But doesn't it go on to say that if there is no due process violation, then there can't be a deprivation of counsel? In other words, we've got a factual finding that the lawyer was involved. And if that's the case, then there is no absence of counsel under the Sixth Amendment. So I'm not sure Musladeen supports your position. I disagree that there's a factual finding that the lawyer was present for the formulation of the answer to which this court has to defer. And I did want to save a minute for rebuttal. I'll give you some time on rebuttal. But isn't the finding of the State court that the formulation of the response was not ex parte fatal to your argument under Musladeen? No, it's not, Your Honor. It's not at all. Because whether or not the judge was solely to blame or counsel was involved and also to blame doesn't change the fact that this was a deprivation of due process. The deprivation that was argued was the lack of participation by counsel for the defense. And there's a finding that counsel did participate, that it wasn't an ex parte formulation of the response. Well, even if counsel did that, that would — counsel cannot waive Mr. Swoop's right to a fair trial.  If counsel participated, what's unfair about the defense lawyer communicating with the judge and determining how to answer the jury's question? I disagree that there's a factual finding that the defense attorney participated. And also, the issue of the suggestive identifications, while also grounds for relief, also underscore just how critical the prejudicial impact of the judge's response. Weren't the witnesses subject to cross-examination on all of this at trial? They were, Your Honor, which is precise. The jury heard all this on cross-examination, but apparently credited the victim witnesses in the identification. Or credited the prosecutor's misstatement and the judge's corroboration of that. Thank you, Your Honor. I will give you that. Can I say one more thing? Sure, absolutely. I just want to make a passing observation. And I think you should respond to it if you care to. I think the result of Musil ad-Din supports your argument. But I don't think that that court ever made a finding or said, in the opinion, that talking to the jury absent consultation with the lawyers requires automatic reversal under chronic. You could extrapolate. And that's certainly what happened there. But I have a feeling that's an open question in the Ninth Circuit. Well, Your Honor, thank you. And I would point the court to Martinez, which is also in the briefs, in which this court found error requiring automatic reversal when a judge responded to a jury note without consulting counsel. Okay. Yes, of course. And when I was a trial lawyer, when there was a jury note, the clerk would call us and tell us there was a note. And we'd come over if at all possible. And if not, it might be resolved by a telephone conference. And at a different state, it's not evidence or anything. But it made me able to understand what the state court opinion was to which we have to give deference. The Court of Appeals of Arizona published opinion. And it says, again, trial counsel's lack of recollection negates neither the trial court's observation that Judge Meehan probably, quote, contacted counsel off the record about the note as was customary and failed to make a subsequent record, nor the court's implicit ruling that no ex parte communication with the jury had I don't see how, under pre-EDPA 2254d, we have any room to reach a different conclusion than that the lawyer for Swoops was, in fact, consulted about what advice the judge would give to the jury. Your Honor, no court has stated that Mr. Swoops was apprised of that jury note. As for Mr. Swoops, I was curious about the same thing that you raise. And it might be more significant if that had been Swoops' argument. He didn't say that he personally wasn't present. He said his position is basically his lawyer wasn't present and consulted. His, I'm sorry, his affidavit stated that he had not seen that jury note. Yes, I know, but that's different. If he didn't personally see the note himself, that's not the same thing as his lawyer not having a role in helping the judge instruct the jury about the note and knowing about the note. It's between him and his lawyer, just the extent to which his lawyer actually shows him the evidence instead of just describing it to him? There's really only one reasonable way to interpret the judge's reply, and it strains credulity that any attorney would have agreed to that. The judge's reply, as you put it, there was another sentence immediately following that sentence about how it was inadmissible. He says, rely on your collective memories. And I'd say that's the most common instruction that the judges give when the jury asks for replays of something because they don't want to overemphasize it. There are a lot of authorities that say it's a better exercise of discretion not to replay the testimony because it will overemphasize it. But in this case, it wasn't just inadmissible testimony. It was a false statement. And that's why, under Donnelly, the court needed to take stronger action. OK. Thank you. Thank you, counsel. We'll hear from the state. Thank you, Your Honors. May it please the court, counsel. David Simpson from the Arizona Attorney General's Office on behalf of the respondents. I'll start with the jury note claim, and there are three important points to make about that claim. First, the petitioner has not carried his burden of overcoming the state court's findings that the note was not ex parte. How did the state court, the Arizona Court of Appeals, come to that conclusion? So like my colleagues and your opponent, I never read that there was any specific consultation of this trial judge with the lawyers at any point. There was, what would you say, indirect or circumstantial evidence of that. But how did they come up with that? Correct. So there's no direct evidence of it either way. I think they come up with it. I think there are three facts to consider. So first is the state court's mentioning that this was the common practice in Tucson at the time. The second is we do know from the transcript that something was discussed off the record because the court makes a reference to a conversation that they had had back in my office. The third is viewing that evidence against the evidence that the petitioner had presented in this case. Here's my view. If the Arizona Court of Appeals was correct, then we have to defer and you win. But my question to you is, what if they were incorrect? Can we second guess an incorrect legal factual finding of a state court on habeas review and let it go? Or do we get behind and second guess that as a federal court under 2254? Under pre-AEDPA standards, this court could second guess it, but it would have to surmount a very, very high burden to do so. And so I would just point out, Judge Kleinfeld had read one part of the state appellate court's decision. There's another, I think just two paragraphs before, where the state appellate court says, The trial court found there was insufficient evidence that any ex parte communication had occurred between Judge Meehan and the jury. Because that finding is not clearly erroneous, we have no basis for disturbing it. That finding, in turn, arguably supports an inference that Swoops' trial counsel had known of, been present for, or otherwise been consulted on Judge Meehan's response to the jury's case. And that was the judge who tried the case, right? Correct. Correct. You think he's a credible judge? Judge Meehan? I'm just kidding. But I mean, I'd probably make that same finding, right? My understanding, actually, is that by the time this came up to the Arizona court of appeals, Judge Meehan had died. And so that's part of the difficulty here, is that the only witness who would have known the prosecutor had died and the judge had died, the defense attorney was the only one who had any knowledge directly, and he had no recollection either way of what happened. Turning to the actual merits of the jury note claim, I do want to kind of sort out the record here to make clear exactly what happened and exactly where the prosecutor was coming from in his statements during closing argument. So there's no dispute that Linda was asked on the night of the crime whether the perpetrator had a scar and said that he did not. Later at the – later at her lineup, she mentions that she's looking for someone with either a blemish or a scar. And so understandably, defense counsel picks up on that during closing argument and argues that the fact that she didn't mention a scar before and then mentioned it later undermines her credibility. So the prosecutor during rebuttal comes back and makes two arguments. So the first argument is that the fact that she did not mention the scar does not undermine her credibility because her identification was based on multiple factors. So if you look at volume 5 of excerpts of the record at 823, he says, quote, and sure, 1 o'clock in the morning when she's sedated and exhausted and in shock, she may not have mentioned the scar. Her memory was refreshed when she saw him. The other argument the prosecutor makes is that maybe when she was asked on the – about the marking on the night, that she thought of it as a blemish instead of a scar. And so that's where – that's where you see at 824 in volume 5 of the record, where he's talking about blemish versus scar. Or I'm sorry, that's 821 in the record. So he says, this lady's been in the hospital, she's been there for a couple of hours, and then skipping ahead, the word blemish kept coming up, she saw a blemish on his face, this guy is asking about a scar, and she's probably doped up at the time as she indicated. Am I correct, incidentally, in thinking that all three victims identified swoops, so the case did not turn solely on Linda's identification of swoops? That's correct, Your Honor. And we also have some corroborating circumstantial evidence as well. So the perpetrators were seen – The cars? The cars, exactly. The perpetrators were seen fleeing the scene in a valiant. There is a valiant that is both tied to swoops and tied to swoops in a way that suggests he's up to no good because its license plate has been switched with the car that swoops is connected to. Switched with the Chrysler license plate? Correct, Your Honor. And both cars were at the mother's house? I believe it was his aunt's house. I drove my parents' valiant in the early 60s. Were they still making them in 1984 when this crime occurred? This would have been a late 60s valiant, Your Honor. So it was an ancient valiant? I don't want to say ancient, Your Honor, but it would have been an older valiant at the time. I saw a Studebaker in a parking lot three or four years ago, and I thought, wow. I mean, this is actually an interesting point, though, that when you think about it, I don't – I have no idea how common valiants were in Tucson in 1984. Obviously, that's – how common they were would impact how persuasive that evidence is, which is probably just another reason to defer to the original fact-finders in this case, because they would have had a better sense of how many valiants were driving around Tucson at the time. But so to get back, though, to the discussion of the blemish for a scar, two things to point out. I think if you read the prosecutor's closing argument in totality, it really doesn't make sense unless the prosecutor is conceding that the victim did not – Linda did not mention a scar on the night of the crime, and that's the portion I've already quoted. Now, the one point where the prosecutor does make a misstatement is where he says, now, they told police that very night about this scar, and then immediately corrects it and says that very day about the scar. When I read this, I thought if I were the defense lawyer or if I were on the jury, I would think Linda's not all that reliable. And those two guys, they may not be 100 percent either because they so much want to get the person that did this to them. But, boy, it's hard to get around the cars because that's something objective. It's like footprints in the snow as opposed to saying, I saw somebody walk through the snow. The footprints really are better. I was wondering, was there any emphasis on the plates and the valiant and the switch plates from the Chrysler in the trial? Oh, I mean, all of that evidence is presented at trial, Your Honor. So I don't think this is – So the jurors were free to say, well, I don't know about these identification witnesses, but those plates are hard to get around. That's correct, Your Honor. And they did call the motorcycle officer who stopped Swoops in the valiant. Stopped him in the Chrysler. Chrysler. Stopped him in the Chrysler. And then later the detective saw that the plate from the Chrysler had been switched to the valiant. That's correct, Your Honor. Okay. That's correct, Your Honor. So that is fairly objective evidence as opposed to the subjective potential of a victim witness wanting to see justice. Correct. Another point to make, of course, Your Honor, is that even if you take a particular piece of evidence in isolation, you could view them all overlappingly. I mean, the mere fact that you have three identifications here instead of just one is significant, I think, in terms of evaluating the overall weight of the evidence. The final point I did want to make about – about just the record itself is the question from the jury, it was, quote, we'd like to see any statement made by Linda of a blemish before the physical lineup. I think – I think defense counsel said earlier of a blemish or a scar. The note itself did not mention a scar, just a blemish. I never understood what the trial judge meant when he said evidence was inadmissible. I understood the second sentence, no, we're not going to put undue evidence – undue emphasis on the evidence regarding Linda's statements, just rely on your memories. But I didn't understand the first thing he said about it being inadmissible. What was he talking about? I don't know, Your Honor. I mean, it's a very strange answer. I mean, I – the best guess I get is the judge was trying to avoid making a comment on the evidence. I mean, I thought every – every bit of evidence on what Linda said about identification at various times would be admissible, obviously. Right. Am I missing something? Right. I know that's absolutely right. I mean, which is – which is why, I mean, if I were the trial judge, I wouldn't have given that answer. I think the statement – saying the statement is not – But you can't tell from context at the time what he was talking about. No. No, you can't. It sounded to me just like talking fancy when what you're saying is no. You can't see it. Right. I don't know – I don't know what the judge meant by that. And it's – it's frankly weird, and I don't have a good explanation for why the judge would have said the statement is not admissible. I think for present purposes, the important point is the judge is saying the statement is not admissible. Rely on your collective memories. The second part I understand. Right. And – I mean, and even if – even regarding the statement is not admissible, of course, the jury is instructed in this case to decide the facts on the evidence, that they shouldn't speculate about any fact, and that they shouldn't be concerned with the reasons behind a trial court's rulings admitting or precluding evidence. Well, maybe this is sort of technical evidence law on prior inconsistent statements, but I assumed that Linda was cross-examined by defense counsel on the fact that she didn't mention a blemish on the night of the crimes. She was questioned about whether she had mentioned a scar on the night of the crime. So isn't the law of evidence, depending on how the victim or the witness answers that question, if she answers it in a way that is inconsistent with what she told the police as reflected in the statement, then isn't the lawyer entitled to read at least that portion of the statement to either impeach or rehabilitate? Yes. I'm not familiar with what the rules of evidence look like in the mid-'80s. Right. I know today it would be admissible either way. Even if it were a prior consistent statement, it would be admissible as a statement. But I'm not sure the whole statement would come in. As I say, this may be a very technical question of evidence rules. Right. And I think the answer is actually today it would come in either way, because it's a statement concerning identification and the witness's name. Right. But the entire, whatever the entire police report was of the interview of the victim would not come in as substantive evidence, as I understand it. That's correct. You would only admit whatever portion of it would be necessary to impeach. I don't think that rule of prior inconsistent statements has changed in the last 30 years. That's correct. It would be you'd only admit whatever portion of the statement would be necessary to impeach. I don't think there's any question here that there was no statement that she ever made about a blemish one way or another before the lineup. And your argument is that if you look at the rebuttal argument, it's essentially conceding that she didn't mention a blemish on the night. And then the prosecutor offers some suggestions to the jury as to why she might not have mentioned a blemish. Right. Right. That's the way I read the prosecutor's closing argument. And, of course, to the extent there's questions about that and how that interacts with the trial court's response to the jury note, the jury or the response to the jury note is telling the jury to rely on their collective memories of the evidence that's been presented at the trial. Who observed the valiant and when? How was the valiant tied to the crime? Mark and Randy both observed the valiant. They both saw the valiant. Correct. They both saw the valiant. And they both said that they were familiar with the valiants before. I think it was either Mark or Randy said that he had a friend who had a valiant and so recognized it particularly. And they identified it as the getaway car on the night of the crime. Correct. Correct, Your Honor. I'm happy to answer any other questions the court may have about that point. I know, I believe Judge Murphy, you had asked a little bit about Ninth Circuit precedent regarding whether a jury note is a critical stage in the proceeding. I think if you read Musladeen in isolation, I think Musladeen could be read to suggest that. I think if you read the Ninth Circuit subsequent precedents, they're really kind of all over the map. What do you say about Martinez, which Ms. Tucker cited when I was engaging with her on that point? I think Martinez sort of recognizes that the Ninth Circuit's precedent is all over the map on this question and lays out arguments on both sides but doesn't really address them. So I think the discussion in Martinez is technically dicta, although it's helpful just for clarifying, in some ways it's just helpful to clarify when certain things aren't clear. I think overall the legal question under chronic really revolves around whether prejudice can be evaluated case by case or whether it's not worth the time to do that because it's so inherently prejudicial. And I think here prejudice could easily be evaluated. You just look at the wording of the note, you weigh it against the other instructions and against the evidence presented at trial and conduct a harmless error analysis in the same way a court would normally conduct a harmless error analysis. And then we do have some Supreme Court cases that have repeatedly reminded the Ninth Circuit that structural error is not something that we immediately turn to. Right. Right. There is, and this may be Musladeen itself, I seem to recall one of the Ninth Circuit opinions, maybe by Judge Berzone, that distinguished between chronic structural error and full monante structural error, basically suggesting that full monante didn't overrule chronic. I think they're still getting to the same point, though, which is is it a harmless error analysis or is Well, we have been reversed before for finding structural error when the Supreme Court said not so fast. That's correct, Your Honor. I see my red light is on, so I'd be happy to answer any other questions the Court has. I don't have anything. I don't have anything. Judge Murphy? No, thank you. All right. In that case, we would ask that the district court judgment be affirmed. Thank you, Your Honor. Yeah, Ms. Tucker, I'll give you a couple minutes. Thank you, Your Honor. I appreciate it. I do have one practical question. As I read the record, has Mr. Skoops been released? Is he now on some form of parole supervision or supervisory leave? He has one year remaining on his sentence, Your Honor. On his sentence. So he's still in custody? He's still in prison. Oh, okay. He's still in prison. Okay. Three quick points regarding deference. Understandably, that's a key concern for the Court. Two things that the state courts found that need to be deferred to first. The state courts did find that the prosecutor's statement was incorrect. That was unequivocal finding of the state courts. Second, the court referred just now with Mr. Simpson to the fact that the post-conviction court ‑‑ I'm sorry, that the court of appeals found no ex parte communications. However, the post-conviction court referred in its findings to the, quote, unfortunate choice of wording. And the court of appeals did not address that, did not challenge that. So the court of appeals really did not get into this issue. It was a very ‑‑ they were looking at preclusion. It was a very quick discussion on their part. So they parroted the post- conviction court saying it was not ex parte. But they ignored the part where the post-conviction court said unfortunate choice of wording. And third, regarding the car, there was ‑‑ there were some conflicts in the car description. So the victims had described it as a four ‑‑ I'm sorry, as a two door, no primer, silver window vents. In fact, the photograph of the valiant taken by detective Scuda that was then used as identification purposes was a four door, not a two door. It did have primer on it. And it did not have silver window vents. So it's not ‑‑ definitely the car evidence was in dispute. Was it a valiant? Well, it was a valiant, Your Honor. And the victims had described it as a car sort of looking like a valiant. But clearly, in particular, given the jury question and the problematic identification, the car was not enough to move this to harmlessness. And finally, I just want to note ‑‑ They did call the traffic officer, though, did they not, to put him behind the wheel of the car? They did. My point is that it did not match in those respects the description given by the victims. And then finally, there are three identifications, but they're all bad. So three bad identifications is no better than one bad one. Thank you. Thank you, Ms. Thugger. The case was very well argued. It is submitted for a decision.
judges: Kleinfeld, Tallman, Murphy